**NOT FOR PUBLICATION**

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

_____
                                   :
JAMAR JUNNE,                       :
                                   :  Civil Action No. 07-5262 (RMB)
            Plaintiff,             :
                                   :
      v.                           :
                                   :       **O P I N I O N**
ATLANTIC CITY                      :
MEDICAL CTR., et al.,              :
                                   :
            Defendants.            :
_____ :

     **APPEARANCES**:
     JAMAR JUNNE, #154003, Plaintiff <u>Pro</u> <u>Se</u>
     Atlantic County Justice Facility
     5060 Atlantic Avenue
     Mays Landing, New Jersey 08330

**RENÉE MARIE BUMB, District Judge**

     This matter comes before the Court upon submission of an amended civil complaint by JAMAR JUNNE (hereinafter "Plaintiff"), who is currently confined at Atlantic County Justice Facility (hereinafter "Facility"). On November 1, 2007, the Court received a civil complaint from Plaintiff (hereinafter "Complaint"), accompanied by Plaintiff's application to proceed <u>in forma pauperis</u> and Plaintiff's account statement. <u>See</u> Docket Entry No. 1. The Court issued an order administratively terminating this action, without filing the Complaint and without assessing a filing fee, and notifying Plaintiff that an administrative termination was not a "dismissal," and Plaintiff may have this case reopened by

submitting a readable amended complaint.  See Docket Entry No. 2. On December 17, 2007, the Clerk received from Plaintiff a timely submitted amended complaint (hereinafter "Amended Complaint").  See Docket Entry No. 3.  Having thoroughly reviewed Plaintiff's allegations stated in the Amended Complaint and the application to proceed in forma pauperis, as required by 28 U.S.C. §§ 1915(e)(2)(B)(ii) and 1915A(b)(1), this Court will dismiss, sua sponte, certain Plaintiff's claims, while the remaining claims will be proceeded past the sua sponte dismissal stage.

## I.  BACKGROUND

In his Amended Complaint, Plaintiff named the following Defendants: (1) Doctor "?" who is a physician working at the emergency room of Atlantic City Medical Center; (2) Atlantic City Medical Center itself; (3) doctor Inez Hubbard, a physician employed, at the time of the events at issue, by the Center for Family Guidance Health System; (4) the Center for Family Guidance Health System itself; (5) Mr. Gary Merline, the warden of Plaintiff's current Facility of confinement; (6) Mr. Richard Mulvihill, a "Department Head" at the Facility; and (7) the County of Atlantic, New Jersey.  See Am. Compl. at 6.

It appears that the events underlying Plaintiff's Amended Complaint occurred in relation to Plaintiff's arrest, which took place on or about June 18, 2007.  See id. at 7-9 (alleging that, on June 18th and 19th of 2007, Plaintiff, being hand-cuffed, was in

2

custody of Atlantic City Police Department and on his way to his current Facility).[1] It also appears that, either during his arrest or shortly prior to it, Plaintiff had an accident that injured Plaintiff's foot shattering his heel. See id.[2]

Therefore, Plaintiff's claims are of two types: one group of claims relates to Plaintiff's medical condition, i.e., his injured foot, while another relates to conditions of his pre-trial confinement unrelated to Plaintiff's injury. With respect to the former, i.e., the medical group of claims, it appears that Plaintiff's injury was such that Plaintiff was largely immobile and needed assistance walking. See id. at 7-8. Consequently, the police officers brought Plaintiff (whom the officers were escorting en route to Plaintiff's current Facility) to the emergency room of Atlantic City Medical Center, for the purposes of having

---

[1]

Plaintiff's record with New Jersey Department of Corrections indicates that Plaintiff was released from confinement (ensuing from Plaintiff's conviction on previous charges) on June 23, 1994. See <<https://www6.state.nj.us/DOC_Inmate/details?x=1071340&n=0>>. The Court, therefore, surmises that, at the time of his submission of the Amended Complaint, Plaintiff was a pre-trial detainee undergoing criminal proceedings related to or ensuing from the charges underlying Plaintiff's May 2007 arrest.

[2]

No statement made in the Amended Complaint suggests that Plaintiff's shuttered heel was a result of actions taken by Atlantic City police officers. See generally, Am. Compl. The Court, therefore, presumes that Plaintiff's foot was injured either as a result of Plaintiff's own actions during his arrest, e.g., as a result of running from the officers, or, alternatively, as a result of events having no relevance to Plaintiff's arrest. The Court, therefore, cannot detect any Fourth Amendment allegations in the Amended Complaint.

Plaintiff's foot examined. See id. at 7. Apparently, Doctor "?" (who worked the emergency room shift during the night from June 18th to 19th of 2007)[3] examined Plaintiff's foot, directed an X-ray test of the foot and, upon studying the results of the test, concluded that Plaintiff had a shattered heel. See id. So concluding, Doctor "?" informed Plaintiff that Plaintiff's foot had to be treated by an orthopedic surgeon, but no orthopedic surgeon was available at Atlantic City Medical Center at that time. See id. Having so informed Plaintiff, Doctor "?" provided Plaintiff with a set of crutches, as well as with a prescription for pain medication (but without serving such medication to Plaintiff), and released Plaintiff to the custody of police officers, expressing the Doctor's belief that the Facility: (a) would provide the pain medication to Plaintiff upon his arrival, and (b) would also arrange for Plaintiff to see an orthopedic surgeon. See id. at 7-9.

However, according to the Amended Complaint, Doctor Hubbard, an employee of the Center for Family Guidance Health System (a medical entity contracted by the Facility), refused to provide Plaintiff the pain medication prescribed by Doctor "?"[4] and

_____

[3]
It appears that Plaintiff's visit to Atlantic City Medical Center was during the night shift from June 18th to 19th of 2007. See Am. Compl. at 7, 10.

[4]
Plaintiff, apparently, was offered pain medications of non-
(continued...)

promised, in oblivious terms, to arrange for medical treatment of Plaintiff's foot but failed to do so for the period of six months or more.  See id. at 10.  Plaintiff asserts that, as a result of Doctor Hubbard's actions, Plaintiff's foot is permanently deformed, he has been suffering from constant pain, and his mobility substantially reduced.[5]  See id. at 11-13.  In addition, Plaintiff asserts that Doctor "?" is also responsible for Plaintiff's pain and injuries because Doctor "?," believing that the Facility's medical staff would provide Plaintiff with proper medication and treatment, neither served Plaintiff with pain medication nor arranged for an orthopedic surgeon during the night when Plaintiff visited the emergency room at Atlantic City Medical Center.  See id. at 7-10.

The second group of claims challenges Plaintiff's conditions of confinement at the Facility.  According to the Amended Complaint,

> upon [his] admission to [the] Facility, [Plaintiff] was housed in the[] medical unit because of [his] foot [injury].  In this unit, the [detainees] were . . . confined to [their] cells for . . . 18 hours a day [for

_____

[4](...continued)
prescription strength, i.e., Tylenol or Motrin.  See Am. Compl. at 11-13.

[5]
According to the Amended Complaint, Doctor Hubbard is no longer employed by the Center for Family Guidance Health System, and Plaintiff's medical case has been reassigned to Doctor Nugen, another physician employed by the Center for Family Guidance Health System.  See Am. Compl. at 20.

> the period of two month from the date of Plaintiff's
> arrival].  This [fact of in-cell confinement] made it
> impossible for [Plaintiff] to use the bathroom located in
> the cell [with the degree of] privacy [desired by
> Plaintiff because the cells were double-bunked, i.e.,
> Plaintiff was housed] on a mobile bunk by the toilet [and
> such position of the mobile bunk made Plaintiff]
> susceptible to urine splattering. [Moreover, Plaintiff's
> sense of privacy was offended when he had] to defecate in
> the presence of [his cell-mate, who was] a total stranger
> [to Plaintiff.  In addition to the foregoing,] on October
> 17, 2007, [i.e., after the 18-hour in-cell confinement
> was lifted,] the medical unit [was] denied fresh air and
> exercise [for one day.  Finally, Plaintiff believes that
> the lack of private cell with a private bathroom] makes
> one susceptible to the smells and sounds of one[']s
> bodily movements which lowers one[']s mannerism to
> maintain good sense of character.

Am. Compl. at 14-15.  Plaintiff concludes his conditions of
confinement group of claims by asserting that, in addition to the
foregoing, his rights have been violated by the collections policy,
under which the Facility deducts $50 monthly lodging fee from the
accounts of those detainees who have sufficient funds on their
prison accounts.  See id. at 16 (asserting that Plaintiff is
injured by this policy because his relatives refuse to deposit
funds on Plaintiff's prison account, wishing to provide funds only
if Plaintiff would use the monies for purchases of items additional
to those already provided by the Facility to all detainees).

## II.  STANDARD FOR SUA SPONTE DISMISSAL

The Prison Litigation Reform Act ("PLRA"), Pub. L. No. 104-
134, §§ 801-810, 110 Stat. 1321-66 to 1321-77 (April 26, 1996),
requires the Court, prior to docketing or as soon as practicable

after docketing, to review a complaint in a civil action in which a plaintiff is proceeding in forma pauperis or a prisoner seeks redress against a governmental employee or entity.  See 28 U.S.C. §§ 1915(e)(2)(B), 1915A.  The PLRA requires the Court to sua sponte dismiss any claim if the Court determines that it is frivolous, malicious, fails to state a claim on which relief may be granted, or seeks monetary relief from a defendant who is immune from such relief.  Id.

"A document filed pro se is to be liberally construed, and a pro se complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers." Erickson v. Pardus, 127 S. Ct. 2197, 2200 (2007) (citations and internal quotation marks omitted); see also Haines v. Kerner, 404 U.S. 519, 520 (1972).

"Federal Rule of Civil Procedure 8(a)(2) requires only 'a short and plain statement of the claim showing that the pleader is entitled to relief.'  Specific facts are not necessary; the statement need only give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." Erickson, 127 S. Ct. at 2200 (citations and internal quotation marks omitted).  As the Court of Appeals recently explained, although "there are reasonable inferences apart from [a constitutional violation] that could be drawn from the complaint . . . the fact that such inferences may be drawn is proof that the dismissal was premature.

The appellants have met their obligation to provide grounds for their entitlement to relief by presenting factual allegations sufficient to raise their right to relief above a speculative level." Stevenson v. Carroll, 495 F. 3d at 65-67.

A claim is frivolous if it "lacks even an arguable basis in law" or its factual allegations describe "fantastic or delusional scenarios." Neitzke v. Williams, 490 U.S. 319, 328 (1989); see also Roman v. Jeffes, 904 F.2d 192, 194 (3d Cir. 1990). "Given the Federal Rules' simplified standard for pleading, '[a] court may dismiss a complaint only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." Swierkiewicz v. Sorema N.A., 534 U.S. 506, 514 (2002) (quoting Hishon v. King & Spalding, 467 U.S. 69, 73 (1984)); see also Thomas v. Independence Tp., 463 F.3d 285, 296-97 (3d Cir. 2006); Alston v. Parker, 363 F.3d 229, 233 n.6 (3d Cir. 2004).

III.   **DISCUSSION**

A.   **"Color of Law" Requirement**

Federal courts are courts of limited jurisdiction.  See Mansfield, C. & L. M. Ry. Co. v. Swan, 111 U.S. 379, 383 (1884). "[T]hey have only the power that is authorized by Article III of the Constitution and the statutes enacted by Congress pursuant thereto." Bender v. Williamsport Area School Dist., 475 U.S. 534, 541 (1986). A district court may exercise original jurisdiction over "Cases, in Law and Equity, arising under this Constitution,

the Laws of the United States, and Treaties made, or which shall be made, under their authority." U.S. Const. art. III., § 2; see also 28 U.S.C. § 1331.

Section 1983 does not create substantive rights; rather, it provides an avenue of recovery for the deprivation of established federal constitutional and statutory rights. See Kneipp v. Tedder, 95 F.3d 1199, 1204 (3d Cir. 1996); Groman v. Twp. of Manalapan, 47 F.3d 628, 633 (3d Cir. 1995). Specifically, Section 1983 of Title 42 of the United States Code authorizes a person such as Plaintiff to seek redress for a violation of his federal civil rights by a person who was acting under color of state law. Section 1983 provides in relevant part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory . . . subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

42 U.S.C. § 1983.

Thus, to recover under 42 U.S.C. § 1983, a plaintiff must show two elements: (1) a person deprived him or caused him to be deprived of a right secured by the Constitution or laws of the United States, and (2) the deprivation was done under color of state law. See West v. Atkins, 487 U.S. 42, 48 (1988); Adickes v. S.H. Kress & Co., 398 U.S. 144, 152 (1970); Groman, 47 F.3d at 633.

"The color of state law . . . is a threshold issue; there is

9

no liability under [Section] 1983 for those not acting under color of law." Id. at 638.  The color of state law element in a section 1983 action requires that "the conduct allegedly causing the deprivation of [the plaintiff's rights] be fairly attributable to the State." Lugar v. Edmonson Oil Co., 457 U.S. 922, 937 (1982). For the conduct to be "fairly attributable" to the State, (1) the deprivation must be caused by (a) the exercise of some right or privilege created by the State or (b) by a rule of conduct imposed by it or by a person for whom the State is responsible, and (2) the defendant must be a person who may fairly be said to be a state actor, either because the person (a) is a state official, (b) acted together with or has obtained significant aid from state officials, or (c) performed conduct otherwise chargeable to the State. See id. at 936-39.

The United States Supreme Court has articulated several instances where a private party's actions may be fairly attributed to state action, including when: (1) it results from the State's exercise of "coercive power"; (2) the State provides significant encouragement, either overt or covert; (3) a private actor operates as a willful participant in joint activity with the State or its agents; (4) a nominally private entity is controlled by an agency of the State; (5) a private entity has been delegated a public function by the State; or (6) the private entity is entwined with governmental policies, or the government is entwined in its

10

management or control.  See Brentwood Acad. v. Tenn. Secondary Sch. Ath. Ass'n, 531 U.S. 288, 296 (2001) (internal quotations and citations omitted).  The Court, in deciding whether a particular action or course of action by a private party is governmental in character, must examine: (1) the extent to which the actor relies on governmental assistance and benefits; (2) whether the actor is performing a traditional public function; and (3) whether the injury caused is aggravated in a unique way by the incidents of governmental authority.  See Edmonson v. Leesville Concrete Co., 500 U.S. 614, 621 (1991).

The Defendants named in Plaintiff's Amended Complaint could be roughly subdivided into four groups: (1) officials of New Jersey Department of Corrections, i.e., warden Merline and Mr. Mulvihill, the head of unspecified department within the Facility; (2) a governmental entity, i.e., Atlantic County; (3) contracted providers of medical services to the Facility, i.e., the Center for Family Guidance Health System and its personnel; and (4) Atlantic City Medical Center and its employees.  According to the Amended Complaint, there is a clear distinction between the status of the Center for Family Guidance Health System (and its personnel) and that of Atlantic City Medical Center (and the personnel of that entity): while Plaintiff is alleging that the former is an agent for the State, being contracted by the Facility, there is no such or similar allegations with respect to the latter.  See Am. Compl.

at 6 (clarifying that the Center for Family Guidance Health System is a contracted agent, while Atlantic City Medical Center is a medical facility located in Atlantic City). Moreover, no statement made in the Amended Complaint suggests that the police officers brought Plaintiff to the Medical Center because of any affiliation between the State (or the State's law enforcement officials) and the Medical Center. See id. at 7. Rather, according to the Amended Complaint, the officers, being cognizant of Plaintiff's foot injury, brought Plaintiff to the Medical Center's emergency room in the fashion identical to that of any person seeking emergent medical attention. See id. In sum, nothing in Plaintiff's allegations suggests that the examination of Plaintiff's foot by Doctor "?" in the emergency room of the Medical Center was "governmental in character," since neither the Medical Center nor its employee Doctor "?" relied on any governmental assistance or benefits or unique governmental authority when Doctor "?" had Plaintiff's foot X-rayed and provided Plaintiff with his diagnosis and prescription for pain medication. Consequently, while the Court may conclude that Plaintiff sufficiently met the color-of-law pleading requirements with respect to the Center for Family Guidance Health System, the Amended Complaint provides the Court with no allegations, short of Plaintiff's own bald conclusions, suggesting that either Atlantic City Medical Center or

Doctor "?" acted under the color of law.[6]  See Edmonson v. Leesville Concrete Co., 500 U.S. 614, 621 (1991).  Therefore, this Court will dismiss, without prejudice, Plaintiff's allegations against Atlantic City Medical Center and Doctor "?" for failure to meet the color-of-law requirement.[7]  The Court stresses, however, that such dismissal shall not be interpreted as this Court's opinion that Plaintiff may or may not have a viable claim against these entities based on state tort-law theories.

---

[6] Notably, the public web-site of Atlantic City Medical Center indicates that the Medical Center is a regular health facility open to general public and treating a quarter-million population residing in the neighborhood.  See <<http://www.state.nj.us/health/ healthfacilities/presentations/acmc_bane.pdf>>.  The Medical Center is similarly registered by referral entities.  See, e.g., <<http:// www.alacrastore.com/company-snapshot/Atlantic_City_Medical_Center _Inc-3143496>> (referring to the Medical Center as a "General Medical and Surgical Hospital).  By contrast, the Center for Family Guidance Health System advertises itself as "healthcare services for hospitals and correctional facilities."  See <<http://www.cfg healthsystems.com/>>.

[7] The Court also notes, in passing, that Plaintiff's allegations against the Medical Center, based solely on the theory of respondeat superior (detailed infra), fail to meet the pleading standard necessary for a Section 1983 claim.  Similarly, Plaintiff's allegations against Doctor "?" (stating that the Doctor erred in his belief that Plaintiff would be treated by the Facility's medical personnel in accordance with the diagnosis rendered by the Doctor) do not indicate that Doctor "?" developed his belief about Plaintiff's prospective treatment at the Facility in order to "punish" Plaintiff.  Thus, Plaintiff's claims against Doctor "?" fail to assert that the Doctor violated Plaintiff's Fourteenth Amendment rights (discussed infra).  Consequently, even if this Court were to ignore Plaintiff's failure to assert that the Medical Center and Doctor "?" acted under color of law, Plaintiff's allegations against these entities would be dismissed without prejudice for failure to state a claim upon which relief may be granted.

**B.**   **Due Process Claims**

Since "the Due Process rights of a pre-trial detainee are at least as great as the Eighth Amendment protections available to a convicted prisoner," Reynolds v. Wagner, 128 F.3d 166, 173 (3d Cir. 1997) (citation omitted); see also Bell v. Wolfish, 441 U.S. 520, 544 (1979); City of Revere v. Massachusetts, 463 U.S. 239, 244 (1983), the Eighth Amendment sets forth the floor for the standard applicable to the claims of pre-trial detainees. See Bell, 441 U.S. at 544. Thus, a failure of prison officials to provide minimally civil conditions of confinement to pre-trial detainees, or deliberate indifference to a serious medical needs of such detainees, violates their right not to be punished without due process of law. See Reynolds, 128 F.3d at 173-74; Monmouth County Correctional Institution Inmates v. Lanzaro, 834 F.2d 326, 345-46, n.31 (3d Cir. 1987); see also Estelle v. Gamble, 429 U.S. 97, 104 (1976); Farmer v. Brennan, 511 U.S. 825 (1994).

### 1.   Conditions-of-Confinement Test

Addressing a conditions-of-confinement claim, the court should analyze whether a civil detainee has been deprived of liberty without due process; such analysis is governed by the standards set out by the Supreme Court in Bell v. Wolfish, 441 U.S. 520. See Fuentes, 206 F.3d at 341-42.

> In evaluating the constitutionality of conditions or restrictions of [civil] detention that implicate only the protection against deprivation of liberty without due process of law, we think that the proper inquiry is

14

whether those conditions amount to punishment of the detainee. For under the Due Process Clause, a detainee may not be punished prior to an adjudication of guilt in accordance with due process of law. . . . Not every disability imposed during [civil] detention amounts to "punishment" in the constitutional sense, however. Once the government has exercised its conceded authority to detain a person pending trial, it obviously is entitled to employ devices that are calculated to effectuate this detention. . . . A court must decide whether the disability is imposed for the purpose of punishment or whether it is but an incident of some other legitimate governmental purpose. Absent a showing of an expressed intent to punish on the part of detention facility officials, that determination generally will turn on whether an alternative purpose to which [the restriction] may rationally be connected is assignable for it, and whether it appears excessive in relation to the alternative purpose assigned [to it]. Thus, if a particular condition or restriction of [civil] detention is reasonably related to a legitimate governmental objective, it does not, without more, amount to "punishment." Conversely, if a restriction or condition is not reasonably related to a legitimate goal--if it is arbitrary or purposeless--a court permissibly may infer that the purpose of the governmental action is punishment that may not constitutionally be inflicted upon detainees qua detainees.

Id. at 535-39 (quotation marks and citations omitted).

The Court further explained that the government has legitimate interests that stem from its need to maintain security and order at the detention facility. "Restraints that are reasonably related to the institution's interest in maintaining jail security do not, without more, constitute unconstitutional punishment, even if they are discomforting and are restrictions that the detainee would not have experienced had he been released while awaiting trial." Id. at 540. Retribution and deterrence, however, are not legitimate nonpunitive governmental objectives. Id. at 539 n.20. Nor are

15

grossly exaggerated responses to genuine security considerations. Id. at 539 n.20, 561-62.

The Third Circuit established a two-part test in line with Bell:

> we must ask, first, whether any legitimate purposes are served by these conditions, and second, whether these conditions are rationally related to these purposes.  In assessing whether the conditions are reasonably related to the assigned purposes, we must further inquire as to whether these conditions cause [inmates] to endure [such] genuine privations and hardship over an extended period of time, that the adverse conditions become excessive in relation to the purpose assigned to them.

Union County Jail Inmates v. Di Buono, 713 F.2d 984, 992 (3d Cir. 1983).

### 2.   Medical Care Test

Conditions of confinement, which involve an unnecessary and wanton infliction of pain, amount to a violation of a pre-trial detainee's constitutional rights. Accord Rhodes, 452 U.S. at 346, 347.  However, the definition of "unnecessary and wanton infliction of pain" is not static, but is measured by "the evolving standards of decency that mark the progress of a maturing society." Id. at 346 (quoting Trop v. Dulles, 356 U.S. 86, 101 (1958)).  Thus, to prevail on a medical care claim, a detainee must show that the defendants's actions were a punishment not rationally connected to a legitimate goal and, since the standard established under the Eighth Amendment serves as the floor for the purposes of the Fourteenth Amendment test, a detainee asserting that the defendants

16

were deliberately indifferent to his/her serious medical needs certainly meets the Fourteenth Amendment standard.  See Estelle, 429 U.S. 97; Rouse v. Plantier, 182 F.3d 192, 197 (3d Cir. 1999). Persistent severe pain qualifies as a serious medical need.  A medical need is also serious where it "has been diagnosed by a physician as requiring treatment or is . . . so obvious that a lay person would easily recognize the necessity for a doctor's attention." Lanzaro, 834 F.2d at 347.  "Deliberate indifference" exists "where [a] prison official: (1) knows of a prisoner's need for medical treatment but intentionally refuses to provide it; (2) delays necessary medical treatment based on a non-medical reason; or (3) prevents a prisoner from receiving needed or recommended medical treatment." Rouse, 182 F.3d at 197; Durmer v. O'Carroll, 991 F.2d 64 (3d Cir. 1993).  Deliberate indifference is also evident where officials erect arbitrary and burdensome procedures that result in interminable delays and denials of medical care to suffering inmates. See Lanzaro, 834 F.2d at 346-47.

### 3.  Plaintiff's Medical Claims

#### a.  *Claims Against Doctors*

According to the Amended Complaint, Plaintiff has been seeking medical help from doctor Hubbard (and from her replacement, doctor Nugen) for at least six months, all without avail.  Moreover, according to the Amended Complaint, both doctors knew of

Plaintiff's diagnosis, *i.e.*, shattered heel, as well as of his need for medical treatment, same as they knew about the serious pain Plaintiff has been experiencing as a result of not having his injury treated. Consequently, it appears that Plaintiff sufficiently asserted that both doctors were deliberately indifferent to his serious medical need. See Estelle, 429 U.S. 97; Rouse, 182 F.3d at 197. Since Plaintiff's allegations meet the Eighth Amendment test for convicted prisoners, his allegations meet the Fourteenth Amendment test applicable to pre-trial detainees. This Court, therefore, will proceed Plaintiff's claims based on lack of medical treatment past the sua sponte dismissal stage with respect to doctors Hubbard and Nugen.[8]

### b.    *Respondeat Superior Claims*

#### i.    *Allegations Against Atlantic City Medical Center and Prison Officials*

It is well established that supervisory liability cannot be imposed under § 1983 on a respondeat superior theory. See Monell v. Dep't of Soc. Servs., 436 U.S. 658 (1978); Rizzo v. Goode, 423 U.S. 362 (1976). "'A[n individual government] defendant in a civil rights action must have personal involvement in the alleged wrongdoing; liability cannot be predicated solely on the operation

---

[8]
        The Court will direct the Clerk to add Doctor Nugen to the list of Defendants in this action in view of Plaintiff's allegations against Doctor Nugen.

of respondeat superior.'" Evancho v. Fisher, 423 F.3d 347, 353 (3d
Cir. 2005) (quoting Rode v. Dellarciprete, 845 F.2d 1195, 1207 (3d
Cir. 1988).  Personal involvement can be shown through allegations
that a defendant directed had *actual* knowledge of the deprivation
of a plaintiff's constitutional rights.  See id.; Monell, 436 U.S.
at 694-95 (1978).  Supervisory liability may attach if the
supervisor implemented deficient policies and was deliberately
indifferent to the resulting risk or the supervisor's actions and
inactions were "the moving force" behind the harm suffered by the
plaintiff.  See Sample v. Diecks, 885 F.2d 1099, 1117-118 (3d Cir.
1989); see also City of Canton v. Harris, 489 U.S. 378 (1989);
Heggenmiller v. Edna Mahan Corr. Inst. for Women, No. 04-1786, 128
Fed. App. 240 (3d Cir. 2005).  In his Amended Complaint,
Plaintiff's allegations against four Defendants are based on the
theory of respondeat superior, i.e., the Center for Family Guidance
Health System, warden Merline and Mr. Richard Mulvihill, the head
of an unspecified department within the Facility, and the County of
Atlantic.

    Specifically, Plaintiff's claims against warden Merline and
Mr. Mulvihill read as follows:

        [Warden] Merline himself is equally responsible for all
        that [Plaintiff] was forced to endure while under the
        care of [the Center for Family Guidance Health System,
        which] provides [medical care] service[s] in the Facility
        [where Mr. Merline] is warden. . . . Mr. Richard
        Mulvihill . . . himself is equally responsible for the
        many violations of [Plaintiff's] rights . . . in the
        Facility he is oversee[ing]. . . . If any injustices

> [were] suffered by [Plaintiff], . . . Mr. Mulvihill [and
> warden] Merline . . . are equally responsible.  It is
> evident [from the violations of Plaintiff's] rights
> [committed by other] defendants' [through these other
> defendants'] actions or non-actions [that] Mr. Mulvihill,
> like warden Merline, is equally responsible for all
> [Plaintiff] endured [during his stay at] the Facility.

Am. Compl. at 16, 18.

These allegations suggest that Plaintiff is basing his claims against warden Merline and Mr. Mulvihill solely on the theory of respondeat superior, since the Amended Complaint asserts no single fact indicating that either the warden or Mr. Mulvihill implemented any policies which deliberately facilitated Plaintiff's lack of medical treatment or were "the moving force" behind the harm suffered by Plaintiff.  In other words, at the instant juncture, Plaintiff's claims against these Defendants provide this Court with nothing but Plaintiff's conclusion that these Defendants are liable simply because Plaintiff believes that they should be liable.  Such allegations, however, do not amount to a claim cognizable under Section 1983.  Therefore, Plaintiff's claims against these Defendants will be dismissed without prejudice.

### ii. Allegations Against Atlantic County and Its Freeholders

Next, Plaintiff names Atlantic County as a defendant in this action because

> Defendants . . . provide a service on behalf and for the
> Court of Atlantic and everything therein, [and the
> County's] Freeholders . . . make institute and enforce
> policies for and on behalf of the County of Atlantic,

> [the Freeholders] are equally liable for [violations of
> Plaintiff's constitutional rights].

Am. Compl. at 19.  While the Amended Complaint contains the above-
quoted general allegation, it does not state any facts explaining
how the County or its Freeholders actually partook in actions of
other Defendants or how the County or its Freeholders actually
interfered with Plaintiff's constitutional rights.  See id. at 6
(providing the sole other mentioning of the County and stating:
"Name: County of Atlantic.  Official position: Jurisdiction").

Generally, local government units and supervisors are not
liable under § 1983 solely on a theory of respondeat superior.  See
City of Oklahoma City v. Tuttle, 471 U.S. 808, 824 n.8 (1985);
Monell, 436 U.S. at 690-91 (municipal liability attaches only "when
execution of a government's policy or custom, whether made by its
lawmakers or by those whose edicts or acts may fairly be said to
represent official policy, inflicts the injury" complained of);
Natale v. Camden County Correctional Facility, 318 F.3d 575, 583-84
(3d Cir. 2003).  As noted above, "[a] defendant in a civil rights
action must have personal involvement in the alleged wrongs . . .
through [either] personal direction or . . . actual knowledge and
acquiescence."  Rode, 845 F.2d at 1207; accord Robinson v. City of
Pittsburgh, 120 F.3d 1286, 1293-96 (3d Cir. 1997); Baker v. Monroe
Twp., 50 F.3d 1186, 1190-91 (3d Cir. 1995).

Thus, to establish municipal liability under § 1983, "a
plaintiff must show that an official who has the power to make

21

policy is responsible for either the affirmative proclamation of a policy or acquiescence in a well-settled custom." Bielevicz v. Dubinon, 915 F.2d 845, 850 (3d Cir. 1990).  Much like with respect to allegations made against a supervising person or business entity, the plaintiff must demonstrate that, through its deliberate conduct, the municipality was the moving force behind the plaintiff's injury.  See Monell, 436 U.S. at 689.

A policy is made "when a decisionmaker possess[ing] final authority to establish municipal policy with respect to the action issues a final proclamation, policy or edict." Kneipp v. Tedder, 95 F.3d 1199, 1212 (3d Cir. 1996) (quoting Pembaur v. City of Cincinnati, 475 U.S. 469, 481 (1986) (plurality opinion)).  A custom is an act "that has not been formally approved by an appropriate decisionmaker," but that is "so widespread as to have the force of law." Bd. of County Comm'rs of Bryan County, Oklahoma v. Brown, 520 U.S. 397, 404 (1977).

There are three situations where acts of a government employee may be deemed to be the result of a policy or custom of the governmental entity for whom the employee works, thereby rendering the entity liable under § 1983.  The first is where "the appropriate officer or entity promulgates a generally applicable statement of policy and the subsequent act complained of is simply an implementation of that policy."  The second occurs where "no rule has been announced as policy but federal law has been violated

22

by an act of the policymaker itself." Finally, a policy or custom may also exist where "the policymaker has failed to act affirmatively at all, [though] the need to take some action to control the agents of the government is so obvious, and the inadequacy of existing practice so likely to result in the violation of constitutional rights, that the policymaker can reasonably be said to have been deliberately indifferent to the need." Natale, 318 F.3d at 584 (footnote, quotation marks and citations omitted).

Here, Plaintiff does not allege any policy-making, personal involvement, knowledge or acquiescence by the County or its Freeholders in preventing Plaintiff from having his medical needs satisfied.[9] Plaintiff merely asserts a bald claim that these

---

[9] Plaintiff's allegations that Plaintiff was denied a particular prescription-brand pain medication does not alter this Court's analysis. Plaintiff does not state that any County's policy prevented either the distribution of the particular medication sought by Plaintiff or a consultation with an orthopedic surgeon. To the contrary, the statement of Doctor Hubbard quoted by Plaintiff, i.e., that the doctor will think about "where to start" suggests that the existing policies do not prohibit rendition of medical assistance to detainees. See Am. Compl. at 10. Moreover, even if this Court is to presume that the particular prescription given to Plaintiff by Doctor "?" was for a medication which could not have been distributed within a correctional facility under a certain hypothetical County's policy, e.g., because prescription selected by Doctor "?" contained a controlled substance, the existence of a general policy barring distribution of controlled substances and controlled-substance-based medications to inmates does not impose due process liability upon the Facility or County's officials. See Smith v. Crose, 2006 U.S. Dist. LEXIS 64250, at *12-13 (D.N.J. Sept. 7, 2006) (noting that "a refusal to
(continued...)

Defendants have made some policies that resulted in lack of medical treatment.  Consequently, on these allegations, it would appear that the claim against the County and its Freeholders is premised only on the theory of supervisor liability, which is not cognizable in a § 1983 action.  These allegations, therefore, will be dismissed without prejudice, as against County and its Freeholders. Accord Bond v. Doe, 2008 U.S. Dist. LEXIS 5890 (D.N.J. Jan. 28, 2008) (analogously dismissing allegations against a county and its freeholders for failure to state a cognizable claim).

### iii. Allegations Against the Center for Family Guidance Health System

Although the Amended Complaint fails to state a cognizable claim against the County of Atlantic, or Atlantic City Medical Center, or Plaintiff's prison officials, the situation is different with respect to the Center for Family Guidance Health System. While the language used by Plaintiff in his Amended Complaint with respect to the Center for Family Guidance Health System is quite

---

[9](...continued)
disburse controlled substance to inmates as part of the inmate's treatment could be well warranted within the framework of a correctional facility in view of various legitimate safety concerns unique to such environment" and quoting Rochell v. Corr. Med. Servs., 2006 U.S. Dist. LEXIS 37943 (N.D. Miss. Apr. 10, 2006), the case stating that "prison doctors are understandably hesitant to prescribe powerful narcotics to prisoners except when absolutely necessary").  By contrast, misapplication of such hypothetical policy by doctor Hubbard through her refusal to provide Plaintiff with any prescription medication might amount to a cognizable claim if such prescription was both medically warranted and available.

similar to that used in Plaintiff's claims against the prison officials and the County, see Am. Compl. at 13 (stating that the Center for Family Guidance Health System is "equally responsible" for violations of Plaintiff's rights), the presence of other statements in the Amended Complaint indicates that the actions/decisions of doctor Hubbard (and, perhaps, doctor Nugen) were results of their implementations of the Center's policies. See id. at 10-11, 13 (stating that Doctor Hubbard: (a) refused to consider providing Plaintiff with either any form of prescription medication, and (b) notified Plaintiff that she was expected to provide Plaintiff only with "follow-up" medical monitoring rather than any form of primary medical care).   In view of these statements, the Court concludes that Plaintiff sufficiently stated his claim against the Center for Family Guidance Health System, and will proceed that claim past the sua sponte dismissal stage.


    **4.  Plaintiff's Conditions-of-Confinement Claims**

While the Court finds that the Amended Complaint sufficiently states Plaintiff's medical claims against the employees of the Center for Family Guidance Health System and the Center itself, the Amended Complaint fails to state a cognizable conditions of confinement claim.

Plaintiff's conditions of confinement allegations may be subdivided into two key sub-groups: (a) those addressing the issue

25

of double-bunking; and (b) those related to the lack of a private bathroom.[10]  With respect to the latter, Plaintiff alleges that: (a) his exposure to the "smells" and "sounds" of "bodily movements. . .lowers ones (sic) mannerisms to maintain a good sense of character,"  Pet., p. 15, and (b) Plaintiff's need to use the toilet in the presence of a "total stranger" (his cell-mate) caused Plaintiff substantial embarrassment.[11]  Id.  These allegations fail to stage a claim of constitutional magnitude.  The need to have a toilet in the cell appears to be reasonably related to a legitimate governmental objective (i.e., having detainees able to use the toilet at any time the detainees might wish to do so, without the need for constant escort to public bathrooms).  Moreover, the fact of having a toilet placed in a cell housing more than one detainee cannot amount to "punishment," accord Bell, 441 U.S. at 535-39, same as Plaintiff's inability to maintain the highest manners

---

[10]

Plaintiff conflates these two issues by relating the lack of private bathroom to the fact of a *mobile* second bunk in the cell having one permanent bunk.  However, the lack-of-private-bathroom issue would remain absolutely the same had the cell been furnished with two permanent bunks (rather than one permanent and one mobile).  Hence, Plaintiff's lack-of-private-bathroom issue is, effectively, a claim asserting a violation of Plaintiff's rights on the basis of the fact that he was not housed in a private cell.

[11]

Plaintiff is a forty-year-old male who had at least two convictions and, being fully emancipated, served a fifteen-month-long term of imprisonment (based on one of these convictions) while incarcerated in the very same county where he is currently confined.  See <<https://www6.state.nj.us.DOC_Inmate/details?x=1071340&n=0>>.

possible (or his embarrassment ensuing from having another person in the cell while Plaintiff uses the toilet) cannot qualify as a violation of Plaintiff's constitutional rights.[12]  Accord Dawson v. County of Westchester, 373 F.3d 265, 273 (2d Cir. 2004) (observing that the populous of correctional institutions rarely consists of "decorous practitioners of formal etiquette").  Therefore, Plaintiff's condition of confinement claim based on lack of his private cell, or his private bathroom, will be dismissed with prejudice.

Plaintiff's double-bunking claim, *as stated*, fares no better. In Bell, the Supreme Court held that the fact of double-bunking per se did not constitute punishment, and therefore, cannot violate the pretrial detainees' due process rights.  See Bell v. Wolfish, 441 U.S. at 541-43.  The Court explained that only the conditions of confinement provided "in such a manner as to cause [detainees] to endure genuine privation and hardship over an extended period of time" raises a due process concern.  Id. at 542; see also United States v. Sutton, 2007 U.S. Dist. LEXIS 79518 (D.N.J. Oct. 25, 2007) (finding that overcrowding-related deprivations existed where the incarcerations conditions included, inter alia, such hardships

---

[12]
    Plaintiff's Amended Complaint does not suggest that Plaintiff developed any illness or suffered of improper sexual advances from his cell-mate  as a result of Plaintiff's need to either use the toilet in presence of his cell-mate or be present during his cell-mate's usage of the toilet.  See generally, Am. Compl.

as: (a) triple overload of jail population; (b) presence of three toilet commodes, one urinal and four sinks per 64 inmates; (c) the fact of inmates eating while being sat on toilets; (d) frequent violence resulting from overcrowding; (e) severe fly and rodent infestation; (f) dire cold during winter and heat during summer; and (g) either complete lack of ventilation or inputs of fresh air accompanied by big clouds of fiber, dust and dirt); Hennessey v. Atl. County Dep't of Pub. Safety, 2006 U.S. Dist. LEXIS 72754 (D.N.J. Sept. 18, 2006) (finding a possibility of overcrowding-related deprivations in view of the fact that the overcrowding claim was accompanied by allegations that the facility failed to medically screen inmate food handlers and forced the inmates to sit on toilets to eat meals).

Here, by contrast, the Amended Complaint does not suggest that Plaintiff's sleeping on a mobile bunk placed in a cell housing another detainee caused Plaintiff any deprivation and hardship short of unspecified "susceptibility" to "urine splatterings." See generally, Am. Compl. Similarly, the Amended Complaint does not suggest that Plaintiff was singled out for double-bunking, or that the Facility had available cells with permanent unoccupied bunks in its medical unit which it refused to make available to Plaintiff. See id. Rather, the Amended Complaint suggests that Plaintiff's placement in a double-bunked cell within the medical unit was simply a result of the Facility's legitimate goal to house

28

Plaintiff and provide him with medical supervision.   See id. Since, as drafted, the Amended Complaint expresses nothing but Plaintiff's displeasure with less than perfect jail conditions and fails to assert that his housing conditions could have been imposed as "punishment," Plaintiff's condition of confinement claim based on double-bunking will be dismissed without prejudice.

In addition to the above-discussed two key groups of conditions-of-confinement allegations, Plaintiff also asserts that his constitutional right were violated by the Facility's denial of "fresh air and exercise" to the medical unit on October 17, 2007, which the Court construes as an allegation that the detainees housed in the medical unit were prevented from going to the Facility's recreation yard.   Since, under the genuine-privation-and-hardship test set forth in Bell, a denial of recreation yard activities for the period of one day cannot amount to a constitutional violation, the Court will dismiss this claim with prejudice.

### 5.   Collection of Housing Fees

Finally, Plaintiff is challenging the constitutionality of the $50-per-month collection conducted by the Facility, alleging that the collections policy operates as a deterrent to Plaintiff's family members who are willing to deposit funds on Plaintiff's prison account only if the funds would be used for Plaintiff's

personal purchases and provide Plaintiff with items additional to those already supplied by the Facility.[13]

---

[13]

While Plaintiff conflates the issue of the collections policy with his inability to purchase additional items that Plaintiff desires (presumably, from the Facility's commissary), these issues are not related. If Plaintiff's conditions of confinement at the Facility are such that, without additional purchases by Plaintiff, they amount to "punishment" within the meaning of the Due Process Clause, Plaintiff's recourse is to amend his Amended Complaint by detailing the genuine and prolonged hardship and deprivation he has been experiencing: the Facility's responsibility to provide detainees with constitutionally-sufficient conditions of confinement is not affected by the detainees' ability to improve their conditions of confinement through private purchases of necessary items. In other words, the assessment of housing fees associated with one being incarcerated is qualitatively different from the charges that occur when one elects to obtain less attractive amenities by renting a cheaper hotel room and then supplements for the lacking items through additional purchases. See infra note 15 and accompanying text. By contrast, if Plaintiff's prison account is actually charged the housing fee as a result of the collections policy, a different aspect of due process is implicated. See Greenholtz v. Inmates of Nebraska Penal and Correctional Complex, 442 U.S. 1, 7 (1979). To analyze such due process claim, the courts conduct a familiar two-part inquiry: they first determines whether the plaintiff "was deprived of a protected interest, and if so, what process was his due." Logan v. Zimmerman Brush Co., 455 U.S. 422, 428 (1982); see also Holman v. Hilton, 712 F.2d 854, 858 (3d Cir. 1983). Property loss caused by the intentional acts of government officials do not give rise to a procedural due process claim under § 1983 where a post-deprivation remedy satisfying minimum procedural due process requirements is available under state law. See Hudson v. Palmer, 468 U.S. 517 (1984); Holman, 712 F.2d at 856. The New Jersey Tort Claims Act, N.J. STAT. ANN. § 59:1-1 et seq., provides a post-deprivation judicial remedy to persons who believe they were deprived of property at the hands of the State or local government. See Tillman v. Lebanon Co. Correctional Facility, 221 F.3d 410, 421 n.12 (3d. Cir. 2000) (in the event of routine deduction of fees from a prisoner's account, even without authorization, post-deprivation remedies may be adequate). Hence, Plaintiff's recourse, in the event of collection of housing fee from his prison account, is a tort action under the New Jersey Tort Claims Act.

(continued...)

If so, Plaintiff's allegations do not state a cognizable claim.  This matter was expressly addressed by the Court of Appeals for the Third Circuit in <u>Tillman v. Lebanon Co. Correctional Facility</u>, 221 F.3d 410. In <u>Tillman</u>, the plaintiff was assessed a daily charge of $ 10.00 towards the housing expenses incurred by the correctional facility.[14]   <u>See</u> <u>id.</u> at 413.  As a result of this

_____

[13](...continued)

[14]

These actions [are] taken pursuant to the facility's Cost Recovery Program.  Under this program, prisoners are assessed a daily charge . . . towards their housing expenses.  Any money generated through the program goes into the county's general fund, which pays the facility's operating costs.  Significantly, the availability of prison services is not contingent upon keeping a clean account.  Failure to pay does not result in the denial of room, board, clothing, or other services.  Neither can it result in extended prison time or reincarceration.  Instead, when a prisoner lacks sufficient funds to pay the assessments, a negative account balance is created.  Authorities may then take half of any funds, from any source, sent to a prisoner in order to satisfy the negative balance.  Any remainder is credited to the prisoner's inmate account for his or her personal use.  If there is still an outstanding negative balance upon a prisoner's release from jail, any funds remaining in his or her inmate account are put towards the debt.  If any debt still remains unpaid upon release, the ex-prisoner remains responsible for the debt as a civil liability.  The prison attempts to work out a payment plan, but if the debt remains unpaid after release, the account may be turned over to a collection agency. . . . The outstanding balance is also kept on the prison's records, so if the ex-prisoner is later reincarcerated, the prior debt remains in full force while new debt begins to accumulate.

<u>Tillman</u>, 221 F.3d at 414.

31

assessment, half of the deposits made on Plaintiff's prison account, were confiscated.  See id.  Much like Plaintiff in the case at bar, the plaintiff in Tillman challenged the deduction by asserting that the deposits were "sent in to help [him] live better" and taken by the prison authorities in violation of his constitutional rights.  Id. at 415.

The Court of Appeals dismissed that challenge.  Noting that the assessment made presented but a small fraction of the costs associated with having a person housed at a correctional facility,[15] see id., the Court affirmed the decision of the district court finding, inter alia, lack of due process violation.  See id. at 415-17.  The Court noted that "sparing the taxpayers the cost of imprisonment would likely be a constitutionally permissible governmental purpose," id. at 416 (quoting United States v. Spiropoulos, 976 F.2d 155, 168 (3d Cir. 1992)), and found neither a procedural violation in implementation of such collections policy nor a substantive one with respect to having such policy promulgated.[16]  Id. at 421-24.

---

[15]

The annual institutional cost per inmate is approximately $34,600, i.e., about $95 per day.  See <<http://www.state.nj.us/corrections/freqntlyasked.html>>.  The charges assessed by Plaintiff's Facility are, according to the Amended Complaint, $50 per month, i.e., $1.66 per day and, thus, cover less than 2% of the actual costs incurred by the Facility.

[16]

The Court is aware of the fact that the plaintiff in Tillman was not a pre-trial detainee but rather a convicted inmate,
(continued...)

In view of the guidance provided by the Court of Appeals in Tillman, this Court will dismiss, with prejudice, Plaintiff's challenge based on the collection of housing fees.[17]

## IV. CONCLUSION

In view of the foregoing, the Court will: (1) grant Plaintiff's application to proceed in forma pauperis; (2) direct the Clerk to terminate Defendants Doctor "?," Atlantic City Medical Center, warden Merline, Mr. Mulvihill and Atlantic County as Defendants in this action; (3) direct the Clerk to add doctor Nugen as Defendant in this action; (4) dismiss, with prejudice, all

---

[16](...continued)
recommitted to his correctional facility upon violation of parole. The Court, however, believes that the holding of Tillman is equally applicable to pre-trial detainees. Finding otherwise would put form over substance, since a correctional facility collecting housing fees incurs identical expenses per inmate regardless of whether the inmate housed is a convicted offender or a pre-trial detainee. Moreover, any finding that Tillman is inapplicable to pre-trial detainees would anomalously penalize those criminal defendants who are released on bail during their pre-trial stage. Upon their conviction and incarceration, such defendants would be assessed housing fees for the entirety of their prison term, while the others, who spent their pre-trial period in correctional facilities without assessment of a housing fee, would get this pre-trial period credited against their imposed sentences without having the incurred expenses. Consequently, a better reading of the Tillman guidance would be that a plaintiff whose incarceration is eventually deemed legally improper may recoup the housing fees collected, if any, as part of his award in a civil suit for damages caused by such improper incarceration.

[17]
The Court's dismissal of Plaintiff's claim, however, does not preclude Plaintiff from challenging the collections, if they are ever made, under the New Jersey Tort Claims Act.

Plaintiff's allegations based on assessment of housing fees, or on the fact of Plaintiff not being housed in a private cell with his private bathroom, as well as those based on the denial of recreation yard activities on October 17, 2007; (5) dismiss, without prejudice, Plaintiff's medical claims, as well as his conditions of confinement claims based on the fact of double-bunking, as against Defendants Doctor "?," Atlantic City Medical Center, warden Merline, Mr. Mulvihill and the County of Atlantic; and (6) proceed, past the <u>sua</u> <u>sponte</u> dismissal stage, Plaintiff's medical claims, as against doctors Hubbard and Nugen, and the Center for Family Guidance Health System.

An appropriate order accompanies this Opinion.

s/Renée Marie Bumb
**RENÉE MARIE BUMB**
**United States District Judge**

Dated: February 4, 2008